**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**KIMBERLY A.,**

       **Plaintiff,**

**v.**                                                                                         **Case No. 2:23cv563**

**CAROLYN W. COLVIN[1],
Acting Commissioner of Social Security,**

       **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Kimberly A. ("Plaintiff") filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Defendant Carolyn W. Colvin, the Acting Commissioner of the Social Security Administration ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB"), and supplemental security income ("SSI") under the Social Security Act. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. § 636(b)(1)(B)–(C), Federal Rule of Civil Procedure 72(b), Eastern District of Virginia Local Civil Rule 72, and the April 2, 2002, Standing Order on Assignment of Certain Matters to United States Magistrate Judges. ECF No. 6.

Presently before the Court is Plaintiff's brief in support of reversal and remand of the Commissioner's decision denying benefits, ECF No. 8, and the Commissioner's brief in support of the Commissioner's decision denying benefits, ECF No. 9. After reviewing the briefs, the undersigned makes this recommendation without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Eastern District of Virginia Local Civil Rule 7(J). For the following reasons,

---

[1] On November 30, 2024, Carolyn W. Colvin became the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Carolyn W. Colvin for former Commissioner of Social Security Martin O'Malley in this matter.

the undersigned **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## I. PROCEDURAL BACKGROUND

Plaintiff protectively filed applications for DIB and SSI on January 9, 2020, alleging disability due to the following impairments: depression; breast cancer-related peripheral neuropathy; chronic pain; lymphedema; arthralgia of multiple joints; chronic fatigue; PTSD; ADHD; bone, joint, and nerve pain; anxiety; and migraines. R. at 73–74, 88–89.[2] Plaintiff's applications were initially denied on September 21, 2020, and again denied upon reconsideration on October 12, 2021. R. at 103–04. On December 6, 2021, Plaintiff requested a hearing before an administrative law judge. R. at 158, 160.

A hearing was held on February 28, 2023, at which Plaintiff appeared with counsel before Administrative Law Judge Jeffrey Jordan ("the ALJ"). R. at 45–72. Both Plaintiff and an impartial vocational expert testified at the hearing. R. at 53–71. On March 13, 2023, the ALJ issued a decision finding Plaintiff not disabled. R. at 17–37. Plaintiff filed a request with the Appeals Council to reconsider the ALJ's decision, which was denied on September 22, 2023, making the ALJ's decision the final decision of the Commissioner. R. at 1–3.

Having exhausted her administrative remedies, on November 8, 2023, Plaintiff filed a Complaint for judicial review of the Commissioner's decision. ECF No. 1. In accordance with the Supplemental Rules for Social Security Actions, on March 13, 2024, Plaintiff filed a brief in support of reversal and remand of the Commissioner's decision. ECF No. 8. On April 12, 2024, the Commissioner filed a brief in support of the Commissioner's decision denying benefits. ECF

---

[2] "R." refers to the certified administrative record that was filed under seal on February 12, 2024. ECF No. 5, pursuant to Eastern District of Virginia Local Civil Rules 5(B) and 7(C)(1).

No. 9.  Plaintiff did not file a reply brief.  Because the matter is fully briefed, it is ripe for recommended disposition.

## II.  RELEVANT FACTUAL BACKGROUND

The Record included the following factual background for the ALJ to review:

Plaintiff was forty-two years old at the time of her alleged amended disability onset date of August 18, 2020.  R. at 17, R. at 73.  Plaintiff has a high school diploma.  R. at 53.  She lives with her godparents, and her daughter lives close.  R. at 54, 63.  Plaintiff last worked in 2019.  R. at 54-55.  She previously worked as an Executive Assistant at Tidewater Community College, a Community Health Advisor Manager at the American Cancer Society, and a Clinical Support Services Manager at Hampton University.  R. at 55, 56, 57.

Plaintiff was diagnosed with breast cancer in 2010.  R. at 508.  She underwent chemotherapy and had bilateral mastectomies.  R. at 508.  Since then, she has undergone a number of additional surgeries, including a revision and implant removal related to her breasts.  *See e.g.*, R. at 365–67, 443–49, 508, 716, 1604.  Plaintiff also has obesity.  *See e.g.*, R. at 615, 1591.

### A.  Plaintiff's Medical Records Relevant to Alleged Physical Impairments[3]

Throughout the relevant period, Plaintiff regularly saw numerous providers for her physical impairments, including lymphedema, neuropathy and chronic pain, and dyspnea.  Plaintiff also regularly saw her oncology provider, and primary care physician.

#### 1.  Lymphedema

Plaintiff has a history of treatment for lymphedema in her upper left extremity.  R. at 508, 716–17.  R. at 622.  Plaintiff treats her lymphedema with a medical garment, gloves, and compression sleeves.  R. at 621–24.

---

[3] Because Plaintiff's mental impairments are not at issue, the Court does not address Plaintiff's medical records relating to her mental impairments.

Plaintiff sought treatment at the Lymphedema Clinic at Chesapeake Regional Medical Center on July 2, 2020. R. at 623. There, she complained of increased swelling in her right hand, swelling in her left arm, tingling in her fingertips. R. at 623. Plaintiff stated that lately she has been dropping things. R. at 623. Her provider noted she had minor range of motion and strength deficits. R. at 624–25. She attended physical therapy a few days later, and the physical therapist applied a wrap to her left upper extremity to prevent lymph refill. R. at 621. Plaintiff had several additional appointments for physical therapy, but she either cancelled them due to being ill or in pain, and she did not show up to other scheduled appointments. R. at 620–21. Because of her cancellations and no-shows, Plaintiff was discharged from physical therapy. R. at 620.

Plaintiff presented to the emergency department on September 3, 2020, complaining of excessive swelling. R. at 607. She stated that she saw her primary care physician that morning, who instructed Plaintiff to go to the emergency department to have fluid removed. R. at 607–08. By the time Plaintiff was evaluated, the swelling in her right arm had improved, but she was still experiencing swelling in her abdomen and legs. R. at 608. Upon physical examination, Plaintiff had no appreciable swelling to her upper extremities. R. at 610. She was alert and oriented, with intact sensation, and normal motor strength. R. at 610. The emergency department ruled out any acute or life-threatening cause for Plaintiff's swelling and discharged her the following morning. R. at 611.

On other occasions throughout the relevant period, when Plaintiff was seen by a provider but not specifically for lymphedema, she demonstrated no or minimal edema. *See* R. at 602, 750, 1100, 1264, 1469, 1515, 1586, 1499, 1609, 1643.

### 2. Neuropathy, Chronic Pain, and Headaches

Plaintiff also receives regular treatment for neuropathy secondary to chemotherapy treatment for breast cancer. *See e.g.*, R. at 552, 565, 608, 1053.

During a June 2020 telehealth visit with a Physician Assistant at Sentara Neurology, Plaintiff complained of left upper extremity pain, weakness, sensory changes, and confusion. R. at 553. She further complained of a daily headache which started in the base of her neck, and lasted all day. R. at 554. Plaintiff rated the pain of her daily headaches as a 7 or 8 out of 10. R. at 554. Her provider adjusted her medication. R. at 559.

Plaintiff treated with Dr. John Mansoor at the Center for Arthritis and Rheumatic Diseases in September 2020 for neuropathic pain. R. at 685–86. Dr. Mansoor noted Plaintiff's neuropathic pain in her feet seemed to be her main source of pain, and that has caused Plaintiff to fall in the past. R. at 686. He also noted Plaintiff's muscular symptoms worsen with activity. R. at 686. Dr. Mansoor found Plaintiff's symptoms were most consistent with a fibromyalgia component. R. at 685. He reiterated the importance of sleep hygiene, range of motion and aerobic exercise as tolerated. R. at 685. Although Plaintiff endorsed shortness of breath, her physical exam showed no dyspnea and that her respiratory rate looked comfortable. R. at 688.

In early 2021, Plaintiff began treatment with Dr. Theresa Jackson for progressive lower back pain. Upon physical examination, Plaintiff demonstrated tightness across the upper trapezius bilaterally, tenderness to palpation in the lower lumbar region, and multiple tender points across the upper and lower back. R. at 1284. Plaintiff had moderate pain with extension and axial loading, and difficulty transitioning from sitting to standing. R. at 1284. She did not have pain with heel or toe walking, but it was noted that she ambulated with the assistance of a single point

cane.  R. at 1284.  Dr. Jackson referred Plaintiff to aquatic lumbar physical therapy at In Motion Harbor View.  R. at 1281.

At the recommendation of Dr. Jackson, Plaintiff completed seven sessions of aqua therapy to strengthen her body.  R. at 1077, 1268.  Plaintiff reported a temporary reduction of her pain after aqua therapy treatments.  R. at 1268.  However, her pain limited her ability to complete therapy, and she was discharged for violating the clinic's attendance policy.  R. at 1268.  Dr. Jackson noted Plaintiff would be a good candidate for an independent aquatic program to allow her to participate depending on her pain level.  R. at 1268.

Plaintiff was seen by Physician Assistant Aksel Keklik the Sports Medicine and Orthopedic Center Belle Harbour in March 2021 for complaints of knee pain stemming from a motor vehicle accident that occurred in October 2020.  R. at 1077.  While hospitalized for the motor vehicle accident, Plaintiff received a CT scan of her cervical spine, which was negative for fracture, dislocation, or subluxation.  R. at 757.  Plaintiff also had a full range of motion in her neck and no neurological deficits.  R. at 757.  At the appointment with P.A. Keklik, Plaintiff endorsed back pain, arthralgias, joint stiffness, and myalgias.  R. at 1077.  Plaintiff had normal sensation, no detected motor weakness, no swelling, and a full active range of motion.  R. at 1075.

At a follow up appointment with Dr. Jackson, Dr. Jackson noted that Plaintiff was unable to complete aqua therapy due to pain when getting out of bed.  R. at 1317.  Dr. Jackson also reviewed an MRI of Plaintiff's lumbar spine, which demonstrated minimal multilevel degenerative disc disease, mild lower lumbar facet arthrosis, and mild anterior endplate changes.  R. at 1320–21.  Otherwise, the findings were not significant.  R. at 1321.  Dr. Jackson recommended Plaintiff engage in back stretches, sacroiliac exercises, as well as yoga and tai chi.  R. at 1317.

Plaintiff saw neurologist Dr. Belachew Arasho for headaches and neuropathy. At a visit in May of 2021, Plaintiff described numbness and tingling all over extremities, pain over her neck and back, as well as her shoulders, ankles, hands, and knees. R. at 1261. Plaintiff also endorsed feeling tired and weak, and difficulty walking. R. at 1261. As for her headaches, Plaintiff described bilateral headaches with throbbing and soreness from the back of her neck. R. at 1261. Plaintiff stated her pain was a 10 out of 10 in severity, and that she experienced nausea along with her headaches. R. at 1261. Dr. Arasho identified some decreased sensation. R. at 1265. He prescribed medication and advised Plaintiff to follow up in four months. R. at 1267.

Plaintiff again presented to the emergency department on June 15, 2021. R. at 1311. Plaintiff was experiencing bilateral shoulder pain that had progressively worsened over the previous two weeks, in addition to worsening numbness and tingling in both hands. R. at 1311. She further complained that her left shoulder pain radiated to the anterior of her chest and the back of her neck. R. at 1311. Her symptoms worsened with movement and palpation. R. at 1311. Upon physical examination, Plaintiff had chest pain, arthralgias, myalgias, and neck pain. R. at 1313. Her other systems were all reviewed and negative. R. at 1313. She had no decreased sensation and no motor weakness. R. at 1314. The emergency department ordered labs. R. at 1314. There was no diagnosis found, and Plaintiff was discharged the same evening. R. at 1316.

Following her hospital visit, Plaintiff followed up with P.A. Keklik at the Sports Medicine and Orthopedic Center Belle Harbour. R. at 1346. P.A. Keklik found no focal findings in left shoulder, and that upon examination, she had no sensory loss, and no motor weakness. R. at 1346. Further, Plaintiff's symptoms were back to normal after fibromyalgia and nerve-related treatments. R. at 1346.

At a follow up appointment with Dr. Arasho in August 2021, Plaintiff complained of worsening headaches. R. at 1515. Plaintiff explained that her headaches were bilateral and she rated them a 10 out of 10 in severity. R. at 1515. Plaintiff stated the numbness and tingling over her extremities had not changed. R. at 1515. A physical examination demonstrated Plaintiff was not in respiratory distress, and had no edema. R. at 1515. Plaintiff did have muscular tenderness and some decreased sensation. R. at 1515. She demonstrated full strength, with the exception of some poor effort over her lower extremities due to pain. R. at 1515.

Plaintiff continued to treat with Dr. Arasho in early 2022. R. at 1494. She reported almost daily headaches, that were sometimes severe, and worsened with weather changes and other external stimuli. R. at 1493. Plaintiff reported that her neuropathy symptoms were manageable but worsened with exposure to heat. R. at 1493. Additionally, she reported aching lower back symptoms, that radiates throughout her hip and lower extremities. R. at 1494. Plaintiff was trying to do yoga, stretching exercises, and mediations at home. R. at 1494. A physical examination demonstrated the left side of Plaintiff's neck was swollen, but no edema. R. at 1499. Plaintiff demonstrated normal strength, with the exception of some poor effort over the lower extremities from pain. R. at 1499. Dr. Arasho adjusted Plaintiff's medication and instructed her to follow up in four months. R. at 1499.

Plaintiff visited her primary care provider, Nurse Practitioner Susan Whitehurst-Doss in June 2022. There, Plaintiff requested a referral to physical therapy due to chronic pain issues with fibromyalgia, back pain, knee pain, and shoulder pain, and she requested a referral to podiatry for foot care related to her neuropathy. R. at 1583. N.P. Whitehurst-Doss commented that in the past, aqua therapy was very helpful for Plaintiff's symptoms. R. at 1583. Plaintiff reported her asthma was not doing well and she needed to use a rescue inhaler several times per day. R. at 1583. On a

8

physical examination, Plaintiff had no edema, normal respiration and rhythm and her heart sounds were normal. R. at 1586. Plaintiff was slow to rise from a seated position, and she walked slowly. R. at 1586.

At her initial appointment with the podiatrist, the podiatrist noted Plaintiff's neurological examination was essentially intact, with the exception of evidence of nerve entrapment about the tarsal tunnel and course of the fibular nerves. R. at 1725. Plaintiff had no edema, and normal strength and muscle tone in her feet. R. at 1725. Plaintiff's podiatrist fitted her with custom orthotics. R. at 1719. At a follow up appointment, Plaintiff reported that the custom orthotics were helpful, and she was experiencing no pain. R. at 1715–16. Her physical exams showed Plaintiff had some pain and some decreased sensation, but normal strength and muscle tone. R. at 1721, 1718, 1715 1713.

At an appointment with Dr. Arasho in June 2022, Plaintiff reported worsening headaches. R. at 1477–1485, 1679–1686. Dr. Arasho adjusted her medication, advised her to remain active and exercise as much as possible, and instructed Plaintiff to follow up in four months. R. at 1686. At her follow up appointment, Plaintiff noticed some increase in her fibromyalgia pain and joint swelling. R. at 1470. Plaintiff explained that her fibromyalgia pain gets worse when she is more active, like on her recent trip to Washington D.C. R. at 1464. Plaintiff also reported that medication was helping her muscle pain, and her neuropathy symptoms were unchanged. R. at 1470. A physical exam demonstrated the left side of Plaintiff's neck was slightly swollen. R. at 1469. Although she had general tenderness, she exhibited no swelling or edema. R. at 1469. She had normal strength with the exception of poor effort over her lower extremities due to pain. R. at 1469. Her gait was antalgic. R. at 1470. Dr. Arasho advised Plaintiff to make an appointment if she experienced any joint swelling with her pain. R. at 1470.

Plaintiff was seen for chronic bilateral knee pain at the Sports Medicine and Orthopedic Center in June 2022.  R. at 1434.  Plaintiff reported feeling pain over the medial and anterior aspects of the knee, that sometimes radiated up her thigh. R. at 1434.  Her provider reassured her that her knees were intact, as she exhibited no signs of instability, loss of range of motion, or loss of strength. R. at 1434.  Her provider noted that fibromyalgia could be causing the majority of her symptoms. R. at 1434.  Additionally, her provider believed aqua therapy would help Plaintiff's knees, and recommended Plaintiff follow through with aqua therapy treatment before trying more invasive measures. R. at 1434.

At a visit to her podiatrist in December 2022, Plaintiff had some abnormalities in her sensation, as well as pain, in her lower extremities. R. at 1715.  Nonetheless, she demonstrated normal strength and muscle tone, and no edema.  R. at 1716.

In January 2023, Plaintiff presented for a follow up appointment with Dr. Arasho.  R. at 1650.  Plaintiff reported that her pain was manageable, and she noticed her symptoms worsened when she stopped taking 800mg ibuprofen.  R. at 1650.  Plaintiff reported her back pain was tolerable, and her myalgias were better.  R. at 1651.  A physical exam demonstrated normal strength, and an antalgic gait.  R. at 1655.  Dr. Arasho advised that her pain may get intermittently worse with weather changes, and adjusted Plaintiff's medication.  R. at 1656.

### 3. Shortness of Breath/Dyspnea, and Asthma

Plaintiff began to experience shortness of breath/dyspnea[4] and chest pain in early July 2020. R. at 608, 1042, 1034.  She presented to the emergency department for shortness of breath in July 2020. *See* R. at 1034, 1042.  Plaintiff had a negative chest x-ray, normal oxygen saturation,

---

[4] Dyspnea is the term health care providers to describe shortness of breath.  *Dyspnea*, Cleveland Clinic (Nov. 11, 2022), https://my.clevelandclinic.org/health/symptoms/16942-dyspnea (last visited Jan. 13, 2025).  The Court uses both terms interchangeably throughout this Report and Recommendation.

no respiratory distress, and clear lungs. R. at 1042, 1039. During a telehealth visit in August 2020 with primary care provider, N.P. Whitehurst-Doss noted that her respirations were unlabored during the conversation, and that Plaintiff did not cough until N.P. Whitehurst-Doss mentioned that Plaintiff was not coughing. R. at 1044. Only then did Plaintiff begin coughing, which N.P. Whitehurst-Doss described as a dry cough. R. at 1044. Plaintiff was using albuterol and prednisone to treat her shortness of breath, which seemed to help her symptoms. R. at 1037, 1034.

While hospitalized on September 3, 2020, for lymphedema-related swelling, she endorsed shortness of breath and chest pain. R. at 608. Later that month, Plaintiff presented to the emergency department again complaining of shortness of breath. R. at 601. She was experiencing a cough, wheezing, and chest pain. R. at 601. Plaintiff was treated with a nebulizer and steroids. R. at 606. Her test results were normal, and her provider noted she was oxygenating well. R. at. 606. Plaintiff was discharged later that day. R. at 607.

Plaintiff presented to N.P. Whitehurst-Doss on October 26, 2020, complaining of cough and shortness of breath. R. at 1027. Plaintiff stated that her nebulizer helped her symptoms, and that she was looking for a pulmonologist that took her insurance. R. at 1027. Upon a physical exam, Plaintiff's respiration and rhythm were normal, and her lungs were clear. R. at 1030. A few days later, Plaintiff was in a motor vehicle accident and was taken to the emergency room. R. at 751. She was placed on a cardiac monitor, and had normal oxygen levels with no symptoms of respiratory distress. R. at 751. Plaintiff also denied chest pain and shortness of breath. R. at 751. At a follow up appointment with N.P. Whitehurst-Doss in early 2021, Plaintiff endorsed wheezing, and explained that she had used her nebulizer several times during the previous week. R. at 1015. N.P. Whitehurst-Doss noted Plaintiff's respirations were unlabored, and she demonstrated no cough. R. at 1018.

In May 2021, Plaintiff had an appointment with a pulmonologist, Dr. Naveen Akkina.  R. at 1298.  Dr. Akkina found that Plaintiff had a normal chest examination, her lungs were clear to auscultation and percussion, and she had good air entry.  R. at 1298.  Dr. Akkina diagnosed Plaintiff with asthma, and prescribed prescription medication, as well as an inhaler.  R. at 1299.

Plaintiff did not return to Dr. Akkina until July 2022, when she was seen by a nurse practitioner in the office via a telehealth visit.  R. at 1547.  While her asthma was previously doing well, during this visit her breathing was described as "not well controlled."  R. at 1547.  It was noted that while Plaintiff is allergic to dogs, she does have a dog.  R. at 1547.  Plaintiff had dyspnea upon exertion, shortness of breath, coughing, and wheezing.  R. at 1549.  Plaintiff also had a cough with speaking, and a hoarse voice.  R. at 1550.  She denied swelling, weakness, and numbness.  R. at 1549.  Her provider adjusted her medication and instructed her to follow up in three months.  R. at 1551.

At a primary care appointment in early December 2022, Plaintiff indicated that she needed a new pulmonology referral since her insurance no longer covered her previous provider.  R. at 1578.  Plaintiff complained of worsening shortness of breath that occurred at rest and during exertion, a cough, and wheezing.  R. at 1578–79.  Plaintiff reported her inhaler was not improving her symptoms.  R. at 1578.  A physical examination demonstrated wheezing, but normal respiration and rhythm, and clear lungs.  R. at 1581.

Plaintiff presented to a new pulmonology office on January 13, 2023, and saw Nurse Practitioner Tammy Maloney.  R. at 1639.  There, Plaintiff described that she experiences shortness of breath with exertion, such as walking short distances, and that her symptoms worsen with emotional distress, exposure to cold air, and strenuous activity.  R. at 1639.  N.P. Maloney ordered a complete pulmonary function test and adjusted her medication to include a steroid pack.

R. at 1645.  A few weeks later, Plaintiff later reported to Dr. Arasho that the steroid pack improved her asthma symptoms, and she was feeling better.  R. at 1650.

During the relevant period, at various times, Plaintiff reported to other treatment providers about her dyspnea, cough, and asthma symptoms.  *See e.g.*, R. at 688 (reporting shortness of breath, but on physical exam, demonstrating no dyspnea and a comfortable respiratory rate); R. at 1077–78 (denying cough or shortness of breath, and demonstrating normal respiratory rate and effort in March 2021); R. at 1646 (reporting cough, shortness of breath, and chest pain); R. at 1515, 1520 (reporting cough and shortness of breath but upon examination, no respiratory distress in August 2021); R. at 1583, 1586 (reporting that asthma was not doing well, but demonstrating normal respiration and rhythm and clear lungs in June 2022); R. at 1634 (reporting shortness of breath and asthma are under control in January 2023).

### 4.  *Oncology & Other Primary Care*

Throughout the relevant period, Plaintiff continued to monitor any cancer-related concerns with oncology providers.  *See e.g.*, R. at 1621–38.  During a visit in early 2022, Plaintiff reported "feeling well," denied shortness of breath, but had new left-sided upper chest wall pain that she associated with left shoulder pain.  R. at 1621.  A physical examination demonstrated Plaintiff had a normal heart rate and rhythm, clear lungs, and no wheezing.  R. at 1622.  In June 2022, Plaintiff's oncology provider noted she again had a regular heart rate and rhythm, and was not wheezing.  R. at 1612.  Her breast ultrasound returned without abnormalities, and there was no evidence of recurring cancer.  R. at 1611–12.  In January 2023, she returned for a follow up appointment, where Plaintiff denied chest pain, and reported her shortness of breath and asthma were under good control.  R. at 1634.  Plaintiff reported persistent fatigue and a hoarse voice, but her physical exam was otherwise normal, and she walked with a steady gait.  R. at 1635.

Additionally, Plaintiff regularly saw her primary care providers during the relevant period. In January 2021, N.P. Whitehurst-Doss suspected fibromyalgia. R. at 1018. She noted that Plaintiff was "doing too much trying to take care of [her] mother who had [a stroke]." R. at 1018. N.P. Whitehurst-Doss encouraged Plaintiff to focus more on taking care of herself. R. at 1018.

At a primary care visit in February 2022, Plaintiff reported her medication for insomnia, depression, and pain was helping her symptoms. R. at 1588. Her provider noted that she was working with multiple specialists and "overall doing well." R. at 1591. On a physical examination, Plaintiff had normal respiration and rhythm and her heart sounds were normal. R. at 1591. It was noted that Plaintiff rises slowly from a seated position and walks at a slow pace. R. at 1591. In June 2022, N.P. Whitehurst-Doss found that Plaintiff had no edema, normal respiration and rhythm and her heart sounds were normal. R. at 1586. Plaintiff was slow to rise from a seated position, and she walked slowly. R. at 1586.

## B. Relevant Physical Evaluations Completed by State Agency Examiners

### 1. State Agency Consultative Examination

State consultative examiner Dr. Richard Hoffman examined Plaintiff on August 18, 2020. R. at 589–92. Dr. Hoffman reviewed Plaintiff's history of her present illness, her past medical history, family history, and current medications. R. at 589. At the exam, Plaintiff complained of fatigue, difficulty sleeping, peripheral edema particularly in her upper left extremity, palpations, lightheadedness, shortness of breath and dyspnea on exertion, wheezing, and intermittent abdominal discomfort. R. at 590.

Upon physical examination, Dr. Hoffman noted Plaintiff was well nourished, well developed, and in no acute distress. R. at 590. In general, he found Plaintiff was dyspneic at rest, and with significant dyspnea, even minimal exertion during the examination made it difficult to

14

get an adequate examination. R. at 590. Upon an examination of Plaintiff's lungs, her movement was poor and there was bilateral inspiratory and expiratory wheezing and prolongation of the expiratory phase. R. at 590. With range of motion and gait maneuvers, Plaintiff's respiratory rate climbed to 36. Her heart rate and rhythm were normal. R. at 591. Dr. Hoffman observed tenderness near Plaintiff's left hip, as well as significant lymphedema in both upper extremities. R. at 591. He noted the lymphedema was significantly worse on the upper left extremity compared to the upper right extremity. R. at 591. Plaintiff demonstrated 5/5 strength. R. at 591.

During the exam, Plaintiff had moderate to severe difficulty with a heel walk, a toe walk, and a tandem walk during the exam. Significant dyspnea made gait maneuvers difficult. R. at 591. Further, Plaintiff had significant difficulty bearing weight independently on her lower left extremity. R. at 591. She also had difficulty climbing to and from the examination table, and difficulty standing from a seating position. R. at 591.

Dr. Hoffman stated his impression that Plaintiff had "[s]ignificant upper or possibly lower respiratory infection or other respiratory process which is acute in nature" and noted that "[w]ithout further workup []or without access to the workup that has already been performed it is not possible for me to give a prognosis." R. at 591. Dr. Hoffman further assessed that "[t]here is evidence of significant lymphedema of the upper extremities, particularly the upper left extremity" and he "could not get a reliable, repeatable consistent examination due to [Plaintiff's] frequent coughing and difficulty breathing." R. at 591.

Based on his examination, Dr. Hoffman found Plaintiff had the following functional limitations: (1) she could stand approximately 1 hour in an eight-hour workday; (2) she could sit approximately 6 hours in an eight-hour workday; (3) she could lift up to 5 pounds frequently, between 5 and 10 pounds occasionally, and "probably" never more than 10 pounds in an

15

employment setting; (4) due to dyspnea, she would have severe difficulty with any postural activities, including prolonged standing, and walking; (5) due to dyspnea, she would have severe difficulty with any manipulative activities including reaching, handling, feeling, grasping, or fingering; and (5) extremes of temperatures and respiratory irritants would clearly exacerbate her difficulty in breathing. R. at 592. Finally, Dr. Hoffman noted that "an assistive device for walking and for ambulation safety is medically necessary, even within [Plaintiff's] home." R. at 592.

### 2. State Agency Medical Examiners

At the initial level of review, on August 27, 2020, state agency examiner Dr. David Bristow reviewed Plaintiff's record and made findings regarding her functional limitations. R. at 83, 98–100. Dr. Bristow determined Plaintiff had the following exertional limitations: (1) she could occasionally lift or carry 10 pounds, and frequently lift or carry less than 10 pounds; (2) she could stand or walk with normal breaks for 2 hours; (3) she could sit with normal breaks for 6 hours in an eight-hour workday; (4) she could occasionally climb ramps, stairs, ladders, and occasionally stoop, kneel and crawl; (5) she would have no manipulative limitations; and (6) she would need to avoid concentrated exposure to extreme cold, heat, and humidity, and would need to avoid even moderate exposure to fumes and odors. R. at 83–85. Dr. Bristow determined Plaintiff would be capable of performing sedentary work. R. at 86.

At the reconsideration level of review, on October 11, 2021, Dr. Richard McGuffin, Jr. reviewed Plaintiff's record and made findings regarding Plaintiff's functional limitations. R. at 115–17, 131–33. In contrast with Dr. Bristow, Dr. McGuffin determined Plaintiff could: (1) occasionally lift or carry 20 pounds, and frequently lift or carry 10 pounds; (2) stand or walk with normal breaks for 4 hours; and (3) have unlimited exposure to extreme cold, heat, and humidity, and avoid only concentrated exposure to fumes and odors. R. at 115–16. Dr. McGuffin determined

16

Plaintiff would be capable of performing light work. R. at 115–16. He otherwise agreed with Dr. Bristow's limitations. R. at 115–16.

### C. Plaintiff's Testimony at ALJ Hearing

Plaintiff testified that she has residual problems related to her previous diagnosis of stage 3B triple-negative breast cancer and the related treatments. R. at 58. She stated she suffers from fibromyalgia pain throughout her body, nerve pain, migraines, peripheral neuropathy in her hands and feet, as well in her voice box. R. at 58–59. Plaintiff explained that her ailments are a result of receiving strong chemotherapy. R. at 58. Additionally, Plaintiff has lymphedema on the left-side, which makes it difficult to write because she is left-handed. R. at 58. The lymphedema affects her from the upper chest wall down to her elbow, and causes limited feeling and difficulty lifting her left arm. R. at 59. Because of this, she mostly uses her right hand and arm. R. at 62.

As for Plaintiff's mental health issues, she sees a therapist every Tuesday, and has an emotional support dog. R. at 60. She further suffers from asthma, and at the time of the hearing, was diagnosed with severe persistent asthma. R. at 60. Changes in the seasons, anxiety, walking, and environmental contaminants exacerbate her asthma and make it harder to breathe. R. at 60–61.

Plaintiff lives with her godparents but does not receive assistance from them. R. at 63. Her daughter assists her in picking things up from the store. R. at 63. Plaintiff can bathe on her own, and she has a grab bar in the bathtub and bathmats to prevent falling. R. at 63. She is also able to dress herself in basic clothing. R. at 63.

### III. THE ALJ'S DECISION

To determine if the claimant is eligible for benefits, the ALJ conducts a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th

Cir. 2015) (summarizing the five-step sequential evaluation).  At step one, the ALJ considers whether the claimant has worked since the alleged onset date, and if so, whether that work constitutes substantial gainful activity.  §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the ALJ considers whether the claimant has a severe physical or mental impairment that meets the duration requirement.  §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, the ALJ determines whether the claimant has an impairment that meets or equals the severity of a listed impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant does not have an impairment that meets or equals the severity of a listed impairment, the ALJ will determine the claimant's residual functional capacity, that is, the most the claimant can do despite her impairments.  §§ 404.1545(a), 416.945(a).  At step four, the ALJ considers whether the claimant can still perform past relevant work given his or her residual functional capacity.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, at step five, the ALJ considers whether the claimant can perform other work.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The ALJ will determine the claimant is not disabled if: they have engaged in substantial gainful activity at step one; they do not have any severe impairments at step two; or if the claimant can perform past relevant work at step four.  *See Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014).  The ALJ will determine the claimant is disabled if the claimant's impairment meets the severity of a listed impairment at step three, or if the claimant cannot perform other work at step five.  *Id.*; *see also Mascio*, 780 F.3d at 634–35 (noting the ALJ will only determine the claimant's residual functional capacity if the first three steps do not determine disability).

Under this sequential analysis, the ALJ made the following findings of fact and conclusions of law:

18

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the amended alleged disability onset date of August 18, 2020. R. at 19. At step two, the ALJ found that Plaintiff had the following severe impairments: affective disorders; anxiety-related disorder; chronic pain syndrome; lymphedema status post breast cancer; asthma; obesity; and disorders of the lumbar spine. R. at 20. At step three, the ALJ considered Plaintiff's severe impairments and found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. at 20–24.

After step three, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, with the following limitations:

> She can stand or walk no more than one hour total in an[] []8-hour workday and walk no longer than one block at a time with the aid of a cane or crutch. She can stand no longer than 10 minutes at a time. She cannot climb ladders, ropes, or scaffolds, but she can perform other postural movements on an occasional basis. She is limited to simple, routine, and low stress tasks with low stress defined as requiring work with no more than occasional changes in the routine and work that allows her to avoid fast-paced tasks such as assembly-line jobs involving production quotas. She is limited to occasional interaction with the public. She is limited to frequent fingering, grasping, handling and reaching. She cannot work around hazards such as moving dangerous machinery and unprotected heights. She cannot work in environments that would subject her to even moderate exposure to respiratory irritants and extreme temperatures and humidity.

R. at 24.

In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements" of 20 C.F.R. § 404.1529 and § 416.929, and SSR 16-3p. R. at 24.

At step four, the ALJ determined that Plaintiff was incapable of performing her past relevant work as an executive assistant which is considered light work, and as an outreach worker,

which is considered light work, but heavy to very heavy work as actually performed. R. at 35. While Plaintiff cannot resume her prior employment, the ALJ determined at step five that Plaintiff could perform other jobs that exist in significant numbers in the national economy. R. at 35–36. Thus, the ALJ determined that Plaintiff was not disabled from the alleged onset date, August 18, 2020, through the date of his decision, March 13, 2023. R. at 37.

## IV. <u>STANDARD OF REVIEW</u>

Under the Social Security Act, the Court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It consists of 'more than a mere scintilla of evidence but may be somewhat less than a preponderance.'" *Britt v. Saul*, 860 F. App'x 256, 260 (4th Cir. 2021) (quoting *Craig*, 76 F.3d at 589). The Court looks for an "accurate and logical bridge" between the evidence and the ALJ's conclusions. *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

In determining whether the Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589. If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). Accordingly, if the Commissioner's denial

of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. <u>ANALYSIS</u>

Plaintiff's appeal to this Court raises a single challenge to the ALJ's decision—that the ALJ improperly evaluated the persuasiveness of state agency consultative examiner Dr. Hoffman's opinion. *Id.* at 7–12. Plaintiff does not dispute that the ALJ properly analyzed the supportability factor, but disputes that the ALJ properly analyzed the consistency factor. ECF No. 8 at 11 (noting the ALJ's statement that the medical opinion was supported by his own objective exam findings "pass[es] the supportability prong"). In response, the Commissioner argues the ALJ applied the proper regulations in evaluating Dr. Hoffman's opinion, and that the ALJ's analysis is supported by substantial evidence. ECF No. 9 at 16–29.

Under the Social Security Administration regulations[5], the ALJ must consider each medical opinion in the record and articulate how persuasive they find the medical opinion based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. §§ 404.1520c(b), (c)(1)–(5), 416.920c(b), (c)(1)–(5). Supportability and consistency are "the most important factors" in determining the persuasiveness of a medical opinion, and accordingly, the ALJ must explain how he or she considered those factors in the written decision. §§ 404.1520c(b)(2), 416.920c(b)(2). With respect to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are," the "more persuasive the medical opinion[]" will be. §§ 404.1520c(c)(1), 416.920c(c)(1). As for consistency, "[t]he

---

[5] Because this matter involves a claim filed after March 27, 2017, the revised regulations regarding the evaluation of medical opinions set forth in Section 404.1520c apply in this case. Under the new regulations, ALJs no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion." 20 C.F.R. § 404.1520c(a).

more consistent a medical opinion[]" is with "evidence from other medical sources and nonmedical sources," the "more persuasive the medical opinion[]" will be. §§ 404.1520c(c)(2), 416.920c(2). The ALJ may explain how they considered the other factors, including the medical source's relationship with the claimant, but are only required to do so when contradictory medical opinions regarding the same issue are equally supported by and consistent with the record. §§ 404.1520c(b)(2)–(3), 416.920c(b)(2)–(3). If medical opinions regarding the same issue are equally supported by and consistent with the record, the ALJ must articulate the other factors and consider their impact on the persuasiveness of the medical opinions. §§ 404.1520c(b)(3), 416.920c(b)(3).

In evaluating Dr. Hoffman's opinion, the ALJ explained the supportability of Dr. Hoffman's opinion, stating the following:

> Dr. Hoffman's opinions are supported by his examination of the claimant, which showed claimant had significant dyspnea even with minimal exertion and at rest, as well as wheezing and poor air movement, significant lymphedema in the upper extremities, tenderness in the left hip, slow and antalgic gait with use of a cane, and difficulty with heel, toe, and tandem walk, and postural maneuvers. However, he only examined the claimant once, and at that time, she had an acute respiratory process (12F [R. at 589–93]). One September 2020 exam showed claimant had no dyspnea with sitting and talking or with walking and talking (20F/25 [R. at 1039]). A rheumatology visit in September 2020 also showed that she had comfortable respiratory rate and no dyspnea (15F/4 [R. at 688]). Her most recent pulmonary evaluation shows good respiratory findings on exam as well (40F [R. at 1639–1646]).

R. at 33. As for the consistency of the opinion, the ALJ explained the following:

> Dr. Hoffman's assessment is also not entirely consistent with later evidence showing only trace lymphedema (18F/13 [R. at 750]; 38F/32 [R. at 1609]) and evidence showing that she had no pain with heel or toe walking and could single leg stance without difficulty (24F/24 [R. at 1284]). Relatively recent records also indicate claimant is able to manage her pain (41F/4, 9-10 [R. at 1650, 1655–56]). Additionally, some of the limitations Dr. Hoffman describes are vague (e.g., claimant would have "severe" difficulty with any activity requiring "prolonged standing or walking" or "severe" difficulty with manipulative activities).

22

R. at 33. Ultimately, the ALJ explained that he accepted some of Dr. Hoffman's opinions, "such as those indicating [Plaintiff] would be limited to more sedentary-type exertional work" but he did not accept all of Dr. Hoffman's assessment, "which [was] overall only partly persuasive." R. at 33.

### A. The ALJ Properly Evaluated the Consistency of Dr. Hoffman's Opinion, and Substantial Evidence Supports his Analysis.

The Court finds that the ALJ adequately evaluated Dr. Hoffman's opinion by explaining it was only partially persuasive, based in part on its consistency with the overall record. The ALJ recognized that Dr. Hoffman only examined Plaintiff once, and the ALJ determined that later evidence was inconsistent with Dr. Hoffman's findings. R. at 33. Specifically, the ALJ found that Dr. Hoffman's findings regarding Plaintiff's dyspnea, lymphedema, ability to walk without pain, and ability to manage her pain were inconsistent with later evidence in the record. R. at 33. First, regarding Dr. Hoffman's findings that Plaintiff demonstrated significant dyspnea even with minimal exertion, the ALJ noted that at the time of the consultative examination, Plaintiff had an acute respiratory process. R. at 33. He then explained that examinations showed that later in September 2020, Plaintiff had no dyspnea with sitting and talking or with walking and talking, and a comfortable respiratory rate with no dyspnea, and additionally, her most recent pulmonary exam showed good respiratory findings. R. at 33 (citing R. at 1039, 688, 1639–46).

Second, as for lymphedema, the ALJ recognized Dr. Hoffman found significant lymphedema in the upper extremities, but determined that evidence from later examinations was inconsistent with that finding as well. R. at 33. The ALJ cited two medical records in support of his determination that Plaintiff's lymphedema was not as severe as it was during her consultative examination. R. at 33 (citing R. at 750, 1609). The records are from Plaintiff's oncologist, one in

November 2020, the other in March 2022, and both note that upon examination, Plaintiff did not demonstrate edema in her extremities, other than "[t]race left arm lymphedema." R. at 750, 1609.

Third, the ALJ recognized that more recent evidence demonstrated Plaintiff had no pain with heel or toe walking, and could single leg stance without difficulty. R. at 33. In support of this determination, the ALJ cited a March 2021 record from Plaintiff's orthopedist, Dr. Jackson, in which she notes that although Plaintiff ambulates with the assistance of a single point cane, Plaintiff had "[n]o pain with heel or toe walking" and "[n]o difficulty with the single leg stance bilaterally." R. at 1284.

Finally, the ALJ explained that recent records demonstrated that Plaintiff was able to manage her pain. R. at 33 (citing R. at 1650, 1655–56). In support of this determination, the ALJ cited records from Plaintiff's visit with Dr. Arasho in January 2023, demonstrating that Plaintiff "state[d] that she is able to manage her pain," that Plaintiff's fibromyalgia symptoms were only worsening after she ran out of 800 mg ibuprofen, and that Plaintiff "currently says her pain is manageable." R. at 1650, 1655–56.

By using specific citations "from other medical sources" and explaining why Dr. Hoffman's opinions and findings from August 2020 were inconsistent with that evidence, the ALJ adequately explained why Dr. Hoffman's opinion was inconsistent with other evidence in the record. *See* §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ's supportability and consistency analysis was sufficient, and substantial evidence supports the ALJ's opinion that Dr. Hoffman's opinion was only partly persuasive.

In addition to the ALJ's specific analysis of the consistency of Dr. Hoffman's opinion, the ALJ's decision as a whole provides additional support to the ALJ's determination that Dr. Hoffman's opinion was inconsistent with other evidence in the record. An ALJ "'need not repeat

herself regurgitating [the evidence of record] each time that she considers an opinion,' so long as the ALJ points to specific parts of the record that prove consistent or inconsistent with the relevant opinion such that the Court can determine whether substantial evidence supports the weight assigned." *Vanessa M. v. Saul*, No. 3:19cv12, 2019 WL 6749416, at *13 (E.D. Va. Dec. 11, 2019) (quoting *Ross v. Berryhill*, 2019 WL 289101, at *6 (E.D. Va. Jan. 3, 2019)) (citing *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 86 1, 865 (4th Cir. 2014), *report and recommendation adopted*, 2019 WL 281191 (E.D. Va. Jan. 22, 2019)). Here, the ALJ provided a comprehensive opinion that clearly reviewed and analyzed evidence in the record relating to Plaintiff's dyspnea, lymphedema, ability to walk without pain, and ability to manage her pain.

First, in evaluating Plaintiff's RFC, the ALJ provided a separate analysis of the evidence in the record relating to Plaintiff's dyspnea. The ALJ recognized that Plaintiff's asthma was not always well-controlled and referenced exacerbations in her symptoms, including in August 2020, the month that Dr. Hoffman examined Plaintiff. R. at 27. The ALJ explained that her symptoms improved with a nebulizer and steroids, R. at 27 (citing R. at 600–06, 612–17), and she did not have another exacerbation until over a year later in September 2021. R. at 27 (citing R. at 1558). Despite her exacerbation in September 2020, that same month, she had no dyspnea with sitting and talking or with walking and talking. R. at 27 (citing R. at 1039). The ALJ also explained that Plaintiff did well between exacerbations of her symptoms, and her examination results demonstrated her chest was nontender, and she had clear lungs with good air entry. R. at 27 (citing 1298–99, 1556–58). The ALJ noted that in January 2023, her asthma was under good control. R. at 27 (citing R. at 1634).

Second, the ALJ provided a separate analysis of the evidence in the record related to lymphedema. R. at 27. The ALJ again recognized that during her consultative exam with Dr.

Hoffman, Plaintiff had significant lymphedema in both upper extremities. R. at 27. However, he noted that Plaintiff's lymphedema has historically been mild and affects primarily her upper left extremity. R. at 27. (citing R. at 589–92, 716). Shortly after her consultative exam, during one September 2020 exam, Plaintiff had no swelling in her upper extremities. R. at 27 (citing R. at 610). Despite some instances of significant lymphedema, the ALJ found that Plaintiff generally demonstrated at most, minor strength and range of motion deficits. R. at 27 (citing R. at 589–92, R. at 624–25, R. at 1313–14, R. at 1346).

Third, the ALJ cited evidence throughout his decision to demonstrate additional evidence that was both consistent with and inconsistent with Dr. Hoffman's opinion that Plaintiff has difficulty with heel, toe, and tandem walking, and that she needed an assistive device for walking is inconsistent with other evidence in the record. The ALJ recognized that consistent with Dr. Hoffman's opinion, other evidence in the record demonstrated Plaintiff walked with antalgic gait or other gait abnormalities, and that she used a cane to ambulate. R. at 26 (citing R. at 484, 558, 610, 750). However, he later explained that other exams demonstrated Plaintiff walked with a cane but had no pain with heel or toe walking, and no difficulty with single leg stance bilaterally. R. at 28 (citing R. at 1284). The ALJ noted that Plaintiff walked with antalgic gait, but some records did not mention using an assistive device. R. at 28 (citing R. at 1264–65). Most recently, in January 2023, one exam showed Plaintiff had no sensory or motor abnormalities, and a steady gait. R. at 28 (citing R. at 1635).

Finally, the ALJ cited evidence throughout his decision to support his determination that Dr. Hoffman's findings were inconsistent with other evidence in the record demonstrating that Plaintiff could manage her pain. The ALJ explained that Plaintiff's "behavior has not always been consistent with severe pain, and she has reported improvements with treatment." R. at 28 (citing

R. at 1354–59).  For example, the ALJ noted that Plaintiff's symptoms improved after fibromyalgia treatment and gabapentin, her neuropathy symptoms were manageable, medication was helpful, and aqua therapy was helpful, R. at 29 (citing R. at 1346, 1494, 1588, 1583, 1650, 1656).

Thus, the ALJ cited, reviewed, and analyzed numerous records involving Plaintiff's dyspnea, lymphedema, ability to walk without pain, and ability to manage pain, and evaluated whether those records were consistent with Dr. Hoffman's findings and opinion during his August 2020 consultative examination.  The ALJ's analysis provides additional support to his decision to find Dr. Hoffman's opinion only partly persuasive, based on its consistency with the record.

In sum, the ALJ provided a comprehensive review of Plaintiff's record that spans almost six full pages of his opinion and provides numerous, specific citations to Plaintiff's medical record to support the opinion.  The ALJ properly analyzed the consistency of Dr. Hoffman's opinion by comparing it with other evidence in the medical record, and discussions elsewhere in the ALJ's decision provide additional support for his consistency analysis.  Because the ALJ applied the correct legal standard and substantial evidence supports his conclusion, the ALJ did not err.

### B.  Plaintiff's Additional Arguments that the ALJ Erred in His Consistency Analysis are not Persuasive.

Plaintiff makes two additional arguments why the ALJ specifically erred in his consistency analysis.  ECF No. 8 at 8–12.  For the reasons explained below, neither argument warrants remand of the ALJ's decision.

First, Plaintiff argues that the ALJ ignored certain evidence that was consistent with Dr. Hoffman's opinion.  ECF No. 8 at 10.  Plaintiff contends the ALJ "may not rely just upon the unfavorable evidence but must cite and explain both the unfavorable and favorable evidence." ECF No. 8 at 10.  Plaintiff points to certain evidence in the record she contends the ALJ ignored— involving symptoms of malaise/fatigue, dyspnea, persistent fatigue, antalgic or impaired gait with

27

use of a cane, and wheezing or shortness of breath—that she alleges was consistent with Dr. Hoffman's objective exam findings and medical opinion. *Id.* The Commissioner argues in response that the ALJ did not cherry-pick or otherwise ignore treatment records, and in fact, adopted many of Dr. Hoffman's opinions. ECF No. 9 at 17–19, 24–26.

Here, the ALJ explicitly cited and relied upon "favorable" and "unfavorable" evidence in his opinion and did not cherry-pick from the record to support his consistency analysis or otherwise ignore evidence. For example, in discussing Dr. Hoffman's findings that Plaintiff walked with a slow, antalgic gait with a cane and had difficulty walking, the ALJ acknowledged "[o]ther records have also shown antalgic gait or other gait abnormalities at times as well as use of an assistive device/cane." R. at 26 (citing R. at 484, 558, 610, 750). As another example, the ALJ stated that Plaintiff's asthma was "not always well-controlled," but then explained that it has not resulted in too many exacerbations, and provided specific citations to the medical record to support the exacerbations as well as normal findings. R. at 27 (citing *e.g.*, R. at 600–06, 612–17, 1547–51, 1578–81, 1634).

Moreover, contrary to Plaintiff's assertion, the ALJ also acknowledged, cited, and analyzed records involving Plaintiff's symptoms of malaise/fatigue, dyspnea, persistent fatigue, antalgic or impaired gait with use of a cane, and wheezing or shortness of breath. *See, e.g.*, R. at 22 (referencing records that Plaintiff has an antalgic gait); R. at 26 (referencing records that Plaintiff has fatigue, dyspnea, and antalgic gait or gait abnormalities); R. at 27 (analyzing records involving Plaintiff's exacerbations of asthma, shortness of breath, and dyspnea, as well as and normal findings dyspnea); R. at 32 (referencing Plaintiff's antalgic gait, significant dyspnea, and using a cane to walk); R. at 34 (referencing consistency of an opinion stating Plaintiff antalgic gait and use of a cane with other medical records). Not only did the ALJ acknowledge, cite, and analyze

28

records involving the symptoms Plaintiff contends the ALJ ignored, the ALJ included RFC limitations specifically to accommodate those symptoms. *See e.g.*, R. at 26. For example, the ALJ specifically explained that "[d]ue to [Plaintiff's] neuropathic symptoms in her lower extremities as well as fatigue, chronic pain, dyspnea on exertion, and antalgic gait at times . . . [Plaintiff] can stand or walk no more than one hour total in an eight-hour workday and walk no longer than one block at a time with the aid of a cane or crutch." R. at 26. To the extent Plaintiff argues the ALJ did not reference each record Plaintiff contends supports the consistency of Dr. Hoffman's opinion with other evidence in the record, "[t]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision." *Reid v. Comm'r of Soc. Soc.*, 769 F.3d 861, 865 (4th Cir. 2014). Even so, as pointed out by the Commissioner, the ALJ *did* in fact refer to many of the records Plaintiff contends supports the consistency of Dr. Hoffman's opinion. ECF No. 9 at 24. Here, it is clear that the ALJ reviewed and relied upon Plaintiff's medical records, as a whole, in his decision.

Second, Plaintiff contends that the ALJ did not reconcile his finding that Dr. Hoffman's opinion was "only partly persuasive," and his finding that Dr. Bristow's opinion was "persuasive." ECF No. 8 at 11. Plaintiff contends that because Dr. Bristow's medical findings were almost verbatim to Dr. Hoffman's, the ALJ did not sufficiently explain his "weight assessment." *Id.* However, in reviewing Dr. Bristow's opinion, the ALJ specifically explained that Dr. Bristow's opinion was primarily supported by Dr. Hoffman's consultative examination, which, to the Court, explains why Dr. Bristow used similar language in his findings. *See* R. at 32. The ALJ explained that Dr. Bristow's opinion was consistent with the evidence received at the initial level of review (namely, Dr. Hoffman's findings), but that later evidence demonstrated nonfocal findings, manageable pain with treatment, and clear lungs, good oxygen saturation, no respiratory distress,

and no significant complications with edema.  R. at 32.

The ALJ concluded that "as [Dr. Bristow's] assessment  is consistent with evidence received at the hearing level and is somewhat supported, it is persuasive." R. at 32.  But then, the ALJ explained he "found more specific and some more restrictive limitations . . . to account for the combined effect of [Plaintiff's] impairments as well as issues with neuropathy, lymphedema, chronic pain, and obesity."  R. at 32.  Thus, despite calling Dr. Bristow's opinion "persuasive," the ALJ did not adopt Dr. Bristow's opinion wholesale.  *See* R. at 32.  Rather, just like Dr. Hoffman, the ALJ adopted some limitations from Dr. Bristow's opinion, and found limitations that were more restrictive than Dr. Bristow's opinion.  *See* R. at 32.  Plaintiff's contention that the ALJ's weight of these opinions somehow differs is a matter of semantics, and there is no practical difference between the weight given to each opinion.

Accordingly, here the ALJ provided a comprehensive analysis of the record, citing evidence that supported the both the consistencies and inconsistencies of Dr. Hoffman's opinion with the evidence in the record.  The ALJ's opinion sufficiently explains the degree of persuasiveness he gave to Dr. Bristow's opinion and Dr. Hoffman's opinion, and the ALJ's reasoning for those findings.  The ALJ built an "accurate and logical bridge" between the evidence and the ALJ's conclusions, and remand is not warranted.  *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

## VI. **RECOMMENDATION**

Because substantial evidence supports the Commissioner's decision and the correct legal standard was applied, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED**, and that this matter be **DISMISSED WITH PREJUDICE**.

## VII. **REVIEW PROCEDURE**

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for Plaintiff and the Commissioner.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
January 14, 2025

31